UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

:

VIGILANT INSURANCE CO.,

:

:

Plaintiff,

:

:

v.

:

:

TRAVELERS PROPERTY CASUALTY CO. OF

:

AMERICA,

:

:

Defendant.

:

:

------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____         │
│ DATE FILED: March 21, 2017       │
└─────────────────────────────────┘
```

15 Civ. 144 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

The underlying personal injury action that begat this coverage lawsuit was settled some two and one-half years ago; the settlement included, in relevant part, contributions totaling $5.3 million from various insurers, including both parties to this litigation. Contemporaneous with that settlement, Plaintiff Vigilant Insurance Co. ("Vigilant") advised Defendant Travelers Property Casualty Company of America ("Travelers") that it would seek to recover, through equitable subrogation, the $650,000 that Vigilant had paid towards that settlement (the "Payment"). Vigilant made good on its promise in filing this action, and the parties have now filed cross-motions for summary judgment. In brief, Vigilant seeks recovery of the Payment on the grounds that it contributed to the settlement only because of Travelers' improper refusal to acknowledge priority of coverage, while Travelers retorts that Vigilant overreacted and made a voluntary, unreasonable payment for which there is no basis for recovery. For the reasons set forth in the remainder

of this Opinion, the Court grants in part and denies in part the motions; it finds that the Payment was not voluntarily made, and that it was not an obligation for which Vigilant was liable, but also finds a genuine dispute as to whether the settlement was reasonable.

### BACKGROUND[1]

**A.    Factual Background**

**1.    The Accident at the Buffalo Zoo**

In October 2006, the Zoological Society of Buffalo (the "Zoo") entered into a General Construction Contract (the "Contract") with a general contractor, Manning Squires Hennig Co., Inc. ("MSH"), for the construction of a South American Rainforest Exhibit (the "Project") at the Zoo.  (Pl. 56.1 ¶ 6; Def. 56.1 ¶¶ 2-3, 7).  Of note, the Contract required MSH to indemnify and hold the Zoo harmless "[t]o the fullest extent permitted by law" for, among other things, bodily injury caused in whole or in part by any negligent act or omission of

---

[1]    The facts in this Opinion are drawn from the parties' submissions in connection with the cross-motions for summary judgment, including Vigilant's Local Rule 56.1 Statement ("Pl. 56.1" (Dkt. #54)), Travelers' opposition to this statement ("Def. 56.1 Opp." (Dkt. #62)), Travelers' own Rule 56.1 Statement ("Def. 56.1" (Dkt. #51)), and Vigilant's opposition to this statement ("Pl. 56.1 Opp." (Dkt. #63)).  In addition, the Court has drawn on various declarations and affidavits from attorneys and witnesses, along with the exhibits thereto (cited using the convention "[Name] Decl." (Dkt. #47, 48, 52, 55, 58, 59, 60, 64, 67, 68)).  In many cases, the parties have marked the same documents as exhibits; in such instances, the Court will provide only one cite to the document.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c), (d).

For convenience, the Court will refer to Vigilant's brief in support of its motion for summary judgment as "Pl. Br." (Dkt. #53), Travelers' opposition brief as "Def. Opp." (Dkt. #61), and Vigilant's reply as "Pl. Reply" (Dkt. #70).  Similarly, the Court will refer to Travelers' brief in support of its motion as "Def. Br." (Dkt. #50), Vigilant's opposition brief as "Pl. Opp." (Dkt. #56), and Travelers' reply brief as "Def. Reply" (Dkt. #69).

MSH or one of its subcontractors.  (Schmidt Decl., Ex. D, § 3.18). The Contract further obligated MSH to procure insurance for the project, specifically, (i) an Owners and Contractors Protective Liability ("OCP") Policy in the name of the Zoo; as well as (ii) a Commercial General Liability ("CGL" or "GL") policy and (iii) an Umbrella/Excess Liability policy in the name of MSH that provided coverage to the Zoo as an additional insured on a primary and non-contributory basis. (Pl. 56.1 ¶¶ 8-11; Def. 56.1 ¶ 7).

MSH engaged CarvedRock LLC ("CarvedRock"), a specialty concrete company, as a subcontractor on the project in December 2006.  (Def. 56.1 ¶ 8). The subcontract contained, in relevant part, an indemnification provision in favor of both MSH and the Zoo.  (*Id.*; *see also* Schmidt Decl., Ex. E, ¶ 21).  It further required CarvedRock to add MSH and the Zoo to CarvedRock's liability insurance policies as additional insureds on a primary and non-contributory basis.  (Schmidt Decl., Ex. E, ¶ 22).

On April 16, 2008, a laborer on the Project, David Oldread, was seriously injured when he fell from a scaffold while working.  (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 9). According to a report circulated in April 2014 by Oldread's counsel, the April 16 accident (the "Accident") caused severe injuries to Oldread's neck, mid-back, lower back, left shoulder, and left side; required numerous medical procedures; and left him totally disabled.  (Swift Decl., Ex. F).

On April 23, 2009, Oldread commenced an action in New York State Supreme Court, Erie County, captioned *David Oldread and Laura Oldread* v. *CarvedRock, LLC and Zoological Society of Buffalo, Inc.*, Index No. 4772/2009

(the "Oldread Action").  (Pl. 56.1 ¶¶ 1-2; Def. 56.1 ¶¶ 5, 9-11).  The complaint

in the Oldread Action (the "Oldread Complaint") asserted causes of action for

negligence and for violations of the New York Labor Law (the "NYLL").  (Pl. 56.1

¶¶ 2-3; Def. 56.1 ¶ 11).[2]

---

[2]     A bill of particulars filed in connection with the Oldread Complaint, as well as a
Memorandum Decision dated March 28, 2014, from the Honorable Tracey A. Bannister,
Justice of the Supreme Court of the State of New York, Erie County, clarify that the
Oldreads' claims were brought under NYLL §§ 200, 240(1), and 241(6).  (Schmidt Decl.,
Ex. A, C).

NYLL Section 200 pertains to the general duty to protect the health and safety of
employees, and provides in relevant part:

> All places to which this chapter applies shall be so constructed,
> equipped, arranged, operated and conducted as to provide
> reasonable and adequate protection to the lives, health and safety
> of all persons employed therein or lawfully frequenting such places.
> All machinery, equipment, and devices in such places shall be so
> placed, operated, guarded, and lighted as to provide reasonable
> and adequate protection to all such persons.  The board may make
> rules to carry into effect the provisions of this section.

NYLL Section 240(1) provides, in relevant part:

> All contractors and owners and their agents, except owners of one
> and two-family dwellings who contract for but do not direct or
> control the work, in the erection, demolition, repairing, altering,
> painting, cleaning or pointing of a building or structure shall
> furnish or erect, or cause to be furnished or erected for the
> performance of such labor, scaffolding, hoists, stays, ladders,
> slings, hangers, blocks, pulleys, braces, irons, ropes, and other
> devices which shall be so constructed, placed and operated as to
> give proper protection to a person so employed.

NYLL Section 241(6) provides:

> All areas in which construction, excavation or demolition work is
> being performed shall be so constructed, shored, equipped,
> guarded, arranged, operated and conducted as to provide
> reasonable and adequate protection and safety to the persons
> employed therein or lawfully frequenting such places.  The
> commissioner may make rules to carry into effect the provisions of
> this subdivision, and the owners and contractors and their agents
> for such work, except owners of one and two-family dwellings who
> contract for but do not direct or control the work, shall comply
> therewith.

4

### 2.     The Zoo's Potential Sources of Coverage

At the time of the Accident, the Zoo arguably had coverage under a number of insurance policies issued in favor of entities involved in the Project. These included:

- An OCP Policy issued by Travelers to the Zoo (the "Travelers OCP Policy"), covering the policy period from October 2, 2007, to October 2, 2008, with a limit of $2 million per occurrence for bodily injury liability coverage (Def. 56.1 ¶ 14);

- A CGL Policy issued by Travelers to MSH (the "Travelers GL Policy"), on which the Zoo was listed as an additional insured, covering the policy period from October 1, 2007, to October 1, 2008, with a limit of $1 million per occurrence for bodily injury liability coverage (Pl. 56.1 ¶ 9; Def. 56.1 ¶¶ 16, 17);

- A Customarq Series Museums and Cultural Institutions Policy issued by Vigilant to the Zoo (the "Vigilant Policy"), covering the policy period from May 23, 2007, to May 23, 2008, with a limit of $1 million per occurrence and $2 million in the aggregate for bodily injury liability coverage (Pl. 56.1 ¶ 12; Def. 56.1 ¶ 18);[3]

- An Umbrella Prime Commercial Liability Policy issued by National Union Fire Insurance Company of Pittsburgh, PA (a division of the American International Group, or "AIG") to MSH (the "AIG-MSH Umbrella Policy") covering the policy period from October 1, 2007, to October 1, 2008, with a limit of $10 million per occurrence for bodily injury liability coverage (Def. 56.1 ¶ 22; *see also* Pl. 56.1 Opp. ¶ 22 (noting AIG's subsequent disclaimer of coverage));[4]

---

[3]     An "Other Insurance" provision in the Vigilant Policy stated that the coverage provided under that policy was excess to (i.e., subsequent in priority to) any insurance provided to the Zoo under a contract, or under any insurance policy where the Zoo was included as an insured.  (Schmidt Decl., Ex. L at V2255-56).

[4]     An "Other Insurance" provision in the AIG-MSH Umbrella Policy clarified that "[i]f other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the Other Insurance.  However, this provision will not

- A Commercial Excess and Umbrella Policy issued by Federal Insurance Company to the Zoo (the "Federal Excess Policy"), covering the period from May 21, 2007, to May 21, 2008, with a limit of $4 million per occurrence (Def. 56.1 ¶ 29);[5]

- A CGL Policy issued by The Burlington Insurance Company ("Burlington") to CarvedRock (the "Burlington CGL Policy"), covering the period from September 26, 2007, to September 26, 2008, with a limit of $1 million per occurrence and $2 million in the aggregate for bodily injury liability coverage (Def. 56.1 ¶ 31); and

- A Prime Express Commercial Excess Liability Policy issued by AIG to CarvedRock (the "AIG-CarvedRock Excess Policy"), covering the period from September 27, 2007, to September 27, 2008, with a limit of $5 million per occurrence.  (Def. 56.1 ¶ 32).

In May 2009, after receiving notice of the Oldread Action, Vigilant tendered a claim on behalf of the Zoo to Travelers under both of the Travelers policies.  (Pl. 56.1 ¶ 19 (stating a May 5, 2009 tender date); Def. 56.1 Opp. ¶ 19 (stating a May 15, 2009 tender date)).  On May 20, 2009, Travelers agreed to defend and indemnify the Zoo under the Travelers OCP Policy.  (Pl. 56.1 ¶ 20; *see also* Schmidt Decl., Ex. P at 15 ("We have received tender for Chubb as [the Zoo]'s carrier and we have accepted their tender providing coverage under the OCP policy on this file.")).  Vigilant closed its claim file after Travelers accepted the tender, and did not pay substantive attention to the matter for the next five years.  (Pl. 56.1 ¶ 21).

---

apply if the Other Insurance is specifically written to be excess of this policy."  (Schmidt Decl., Ex. V, Part VI.L).

[5]    This policy applied by its terms to cover losses exceeding the limits of several specified underlying insurance policies, including the Vigilant Policy.  (*See* Schmidt Decl., Ex. W at V2467).  Both Vigilant and Federal are members of The Chubb Corporation ("Chubb") group of insurance companies.

### 3.      The Western District of New York Coverage Action

As it happened, Travelers' involvement in the matter predated the Zoo's

May 2009 tender.  MSH was also insured by Travelers, and had advised

Travelers of the Accident on or about April 22, 2008.  (*See* Schmidt Decl., Ex. P

at 2 (Travelers claim notes); *id.*, Ex. NNN (May 15, 2009 email from Chubb to

Travelers referencing Travelers' prior acceptance of defense and indemnification

of the Zoo under the Travelers CGL Policy); *cf.* Swift Decl., Ex. H at V731

(Chubb claim note reflecting that MSH "picked up the [defense and

indemnification] of [the Zoo]")).  Early on, Travelers assessed the Accident

thusly:

> This file is for GL exposure of MSH and any direct claim
> should be barred by [workers' compensation] as we will
> argue that MSH is general employer.  *The real exposure
> on this claim is that which the owner [i.e., the Zoo] faces
> and we do know (from a different file) that we do have
> OCP policy for the owner.*

(*See, e.g.*, Schmidt Decl., Ex. P at 11 (emphasis and alterations added); *see also*

*id.* at 4-5).  Subsequently, Travelers appointed staff counsel, Gary O'Donnell of

the Law Offices of John Wallace (and formerly of the Law Office of Laurie G.

Ogden), to represent the Zoo.  (*Id.* at 15).

Travelers evaluated other possible sources of insurance coverage,

especially policies issued to the subcontractor CarvedRock.  In April, June, and

August of 2008, Travelers tendered a claim for the defense and indemnification

of the Accident to Burlington, the issuer of the CarvedRock CGL Policy.  (*See,*

*e.g.*, Schmidt Decl., Ex. F (correspondence from Burlington in 2008 and 2009

regarding coverage)).  When Burlington disclaimed coverage, the Zoo brought a

declaratory judgment action on January 14, 2010, against CarvedRock and Burlington in the United States District Court for the Western District of New York, seeking coverage under the Burlington CGL Policy. *See Zoological Soc'y of Buffalo, Inc.* v. *CarvedRock, LLC*, No. 10 Civ. 35 (RJA) (HKS) (the "WDNY Coverage Action").[6]

The Zoo contended that CarvedRock's subcontract with MSH required CarvedRock to name the Zoo as an additional insured on the Burlington CGL policy, and thus that the Zoo was covered under that policy.  (WDNY Dkt. #1).[7] For its part, Burlington disclaimed coverage based on the absence of any written agreement naming the Zoo as an additional insured on its CGL Policy. (WDNY Dkt. #1, 6).  Burlington also opposed what it perceived to be the Zoo's efforts to "re-write the policy to extend coverage not only to those '*with whom*' CarvedRock agreed, but also to those '*for whom*' CarvedRock agreed" to provide coverage.  (WDNY Dkt. #90-16 at 6-7 (emphases added)).

In January 2014, the Zoo and Carved Rock brought cross-motions for summary judgment (WDNY Dkt. #89, 90); the motions were referred to United States Magistrate Judge H. Kenneth Schroeder, Jr. (WDNY Dkt. #29, 87 (orders of referral)).  On May 21, 2014, Judge Schroeder issued a Report and Recommendation to United States District Judge Richard J. Arcara,

---

[6]    References to docket entries in this litigation are cited using the convention "WDNY Dkt. [ ]."

[7]    CarvedRock, in turn, brought a third-party complaint against its insurance broker, which complaint was then dismissed for lack of personal jurisdiction.  *See Zoological Soc'y of Buffalo, Inc.* v. *CarvedRock, LLC*, No. 10 Civ. 35 (RJA) (HKS), 2011 WL 6329929, at *10 (W.D.N.Y. Oct. 12, 2011), *report and recommendation adopted*, 2011 WL 6329872 (W.D.N.Y. Dec. 19, 2011).

recommending that the "Buffalo Zoo's motion, be denied and Burlington's
motion, be granted in so far as it seeks judgment declaring that the Buffalo Zoo
is not an additional insured under the Burlington policy issued to
CarvedRock."   (WDNY Dkt. #96 at 10 (internal docket citations omitted)).
While recognizing a lack of unanimity in the case law, Judge Schroeder
concluded,

> [i]n the instant case, the [Burlington] CGL policy
> provides additional insured coverage to organizations
> with whom CarvedRock agreed, in a written contract, to
> add such organization as additional insured on
> CarvedRock's policy. ... [T]his Court finds that the
> language in the Burlington policy clearly and
> unambiguously requires that the named insured
> execute a contract with the party seeking coverage as
> an additional insured.  As there is no dispute that
> CarvedRock did not enter into a written contract with
> the Buffalo Zoo, CarvedRock's agreement in its contract
> with MSH to procure coverage for the Buffalo Zoo is
> insufficient to afford it coverage as an additional
> insured under the plain language of the Burlington
> policy.

(*Id.* at 9-10).  However, the court denied, as beyond the scope of the litigation,
Burlington's cross-motion for summary judgment declaring that it did not owe
coverage to CarvedRock with respect to the cross-claims asserted by the
Buffalo Zoo for contractual indemnity and breach of contract in the Oldread
Action.  (*Id.* at 10).

The Zoo appealed the Report and Recommendation to Judge Arcara, who
adopted it in full.  *See Zoological Soc'y of Buffalo, Inc.* v. *CarvedRock, LLC*,
No. 10 Civ. 35 (RJA), 2014 WL 3748545, at *1 (W.D.N.Y. July 29, 2014).
(WDNY Dkt. #102).  The District Court "agree[d] with Magistrate Judge

Schroeder that those cases which require that there be a contract between the named insured and the putative insured more accurately interpret the endorsement" in the Burlington CGL Policy. *Id.* at *2. Judgment was then entered denying the Zoo's motion for declaratory relief on July 29, 2014. (WDNY Dkt. #103). The Zoo elected not to appeal that decision to the United States Court of Appeals for the Second Circuit.

### 4. The Resolution of the Summary Judgment Motions and the Setting of a Trial Date in the Oldread Action

The Oldread Action proceeded concurrently with the WDNY Coverage Action. Of significance to the instant motion is a Memorandum Decision dated March 28, 2014, and filed on April 3, 2014, in which Judge Bannister resolved cross-motions for summary judgment brought by Oldread, CarvedRock, and the Zoo. (Schmidt Decl., Ex. C). As summarized by Judge Bannister, (i) the Zoo sought summary judgment against Oldread on his various claims, and in the alternative sought contractual indemnification from CarvedRock; (ii) CarvedRock sought summary judgment against Oldread on the grounds that he was the "sole proximate cause" of his injuries or was a "recalcitrant worker," and further claimed that Oldread was a "special employee" of CarvedRock who could not bring a lawsuit against it in light of the Workers' Compensation Law; and (iii) Oldread sought summary judgment in his favor on all claims. (*Id.* at 2).

After summarizing the events leading up to Oldread's fall from the scaffolding, Judge Bannister considered whether Oldread could be said to have been either the sole cause of his injuries or a special employee of CarvedRock.

She first addressed NYLL § 240(1), which required contractors (like CarvedRock) and owners (like the Zoo) to provide workers with scaffolding and other devices "so constructed, placed and operated as to give proper protection to a person so employed." N.Y. Labor Law § 240(1); *see generally Blake* v. *Neighborhood Hous. Servs. of N.Y. City, Inc.*, 1 N.Y.3d 280, 286-90 (2003) (discussing "strict" or "absolute" liability under NYLL § 240(1), and concluding that imposition of liability was contingent on finding that statutory violation was proximate cause of injury, among other things). Under this statute, negligence would not furnish a defense, although contractors and owners would not be liable where an employee's action was the "sole proximate cause of the injury." (Schmidt Decl., Ex. C at 8; *see also id.* at 8-13).[8] Reviewing the evidence under the burden-shifting framework adopted by the Appellate Division, Fourth Department, Judge Bannister concluded that Oldread had demonstrated CarvedRock's and the Zoo's violation of § 240(1) with respect to the manner in which the scaffolding was kept and the absence of protection from falling concrete debris, and, further, that these defendants had not demonstrated that Oldread was the sole proximate cause of his injuries. (*Id.* at 11-14 (citing *Kin* v. *State of N.Y.*, 956 N.Y.S.2d 731 (4th Dep't 2012)).

Judge Bannister then considered Oldread's claims that violations by CarvedRock and the Zoo of certain provisions of the Industrial Code (contained

---

[8]     *See also Ronquillo* v. *N.Y. Botanical Garden*, No. 13 Civ. 9115 (ER), 2016 WL 7387966, at *3 (S.D.N.Y. Nov. 17, 2016) ("This statutory duty is non-delegable and an owner or contractor is liable for a violation even if the job was performed by an independent contractor over which it exercised no supervision or control." (citing *Ross* v. *Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 500 (1993))).

in Title 12 of the New York Code, Rules and Regulations ("NYCRR")), resulted in liability under NYLL § 241(6).[9]  While conceding that the proffered violations of rules regarding scaffolding plank supports and mesh screening could support liability under this provision, the court found questions of fact regarding the effect, if any, of the absence of these items from the job site and the comparative negligence, if any, of Oldread.  (Schmidt Decl., Ex. C at 14-15).

Turning to Oldread's claims under NYLL § 200 and common-law negligence, the court granted summary judgment in favor of the Zoo, finding no evidence that the Zoo exercised control or supervision over Oldread's work. (Schmidt Decl., Ex. C at 15).  It denied CarvedRock's motion in this regard, however, finding that as to CarvedRock, "those claims remain viable."  (*Id.*). Relatedly, Judge Bannister denied Oldread's and CarvedRock's cross-motions for summary judgment concerning Oldread's status as CarvedRock's "special employee," finding questions of fact concerning the degree to which Oldread was controlled by CarvedRock or MSH.  (*Id.* at 15-16).  On April 24, 2014, Judge Bannister issued an order summarizing her decision.  (Swift Decl., Ex. B (order dated April 23, 2014, that, among other things, granted summary judgment in favor of Oldread on the "[NYLL] § 240(1) claim against defendant

---

[9]     The New York Court of Appeals has indicated that the elements of a claim under § 241(6) are (i) the plaintiff was engaged in "constructing or demolishing buildings or doing any excavation in connection therewith"; (ii) the defendant is a contractor, owner or agent who is charged with the duty to comply with the statute; (iii) there exists a specific Industrial Code Rule that applies to the fact pattern under consideration; (iv) the rule was violated; (v) the violation constitutes the failure to use reasonable care, i.e., negligence; and (vi) the negligence is committed by some party to, or a participant in, the construction project.  *Rizzuto* v. *L.A. Wenger Contracting Co.*, 91 N.Y.2d 343, 349-51 (1998).

12

CarvedRock, Inc. pending a determination that CarvedRock was not plaintiff David Oldread's special employer," and denied "defendant CarvedRock, lnc.'s motion for summary judgment on the issue of 'special employment' ... with leave to renew based upon new information that could not reasonably be discovered before")).[10]

Judge Bannister found valid the contractual provision between MSH and CarvedRock that required the latter to indemnify the Zoo for any claims arising out of CarvedRock's acts or omissions causing injury to a person.  (Schmidt Decl., Ex. C at 16).  She observed, however, that her prior findings of liability under § 240, and possibly under § 241(6), implicated non-delegable duties on the part of the Zoo to Oldread.  (*Id.* at 17).

The Zoo had thus been found to be liable to Oldread.  The trial would simply resolve the issues of (i) how much Oldread could recover against it and/or CarvedRock; (ii) whether the record at trial would support CarvedRock's "special employer" defense; and (iii) whether there would be any indemnification rights against CarvedRock and in favor of the Zoo.

---

[10]   The "special employment" determination had significance for two coverage issues.  First, if Oldread had been found to be a special employee of CarvedRock, his claims against it would have been barred by the Workers' Compensation Law.  Second, such a finding might have foreclosed a common-law indemnification claim by the Zoo against CarvedRock — which, as of April 2014, had no assets.  (*See also* Schmidt Decl., Ex. P at 67 ("There is a pending critical issue which the judge ruled was a question of fact and that was whether [CarvedRock] was a special employer of the plaintiff.  If they aren't then we will have a viable common law claim against them; if they are they get dismissed from the direct case and become a third-party defendant.")).

CarvedRock renewed its "special employment" motion in July 2014, on the basis of information obtained during depositions that month.  (Chanin Decl., Ex. 3).  The motion remained pending on Judge Bannister's docket while settlement efforts were ongoing.

### 5.    The Oldread Demand Letter and Its Responses

On April 29, 2014, "per the instructions of Judge Bannister," counsel for Oldread sent a 29-page settlement proposal to counsel for CarvedRock and for the Zoo (the "Demand Letter").  (Swift Decl., Ex. F).  This comprehensive submission outlined the bases for Oldread's pretrial settlement demand of $10.5 million, comprising $2.1 million for future medical expenses, $0.3 million for reimbursement of past medical expenses (most of which had been covered by workers' compensation and were subject to a lien), $2.2 million in lost earnings, $1.6 million for past pain and suffering, $3 million for future pain and suffering, $0.5 million in derivative claims for Oldread's wife, and adjustments for statutory interest and operation of Article 50-B of the Civil Practice Law and Rules.  (*Id.*).  Eventually, trial in the matter was set for September 19, 2014, and a pretrial mediation was scheduled for August 8, 2014.  (Chanin Decl., Ex. 6).

The Zoo was faced with a sympathetic set of plaintiffs, an aggressive plaintiffs' counsel, and a group of insurance carriers whose activities had begun to resemble a game of chicken.  As detailed *supra*, Burlington had by this time moved for a declaratory judgment finding that the Zoo was not an additional insured on its CGL Policy.  (WDNY Dkt. #90).  Its efforts would soon bear fruit; the Magistrate Judge accepted these arguments in his May 2014 recommendation, and the District Judge adopted that recommendation in full in July 2014.  (WDNY Dkt. #96, 102).

AIG followed suit. By letter dated May 29, 2014, AIG advised its insured, MSH, that there was no coverage under the AIG-MSH Umbrella Policy because (i) the primary-level policy (i.e., the Travelers CGL Policy) had not been exhausted or did not apply to the Oldread claim, and (ii) the policy by its terms did not apply to any liability arising under a project insured under a "wrap-up"[11] or any similar insurance plan. (Schmidt Decl., Ex. M). Instead, AIG observed, "there is coverage under an OCP policy issued to [the Zoo] by [Travelers]." (*Id.*; *see also id.* (June 20, 2014 letter from AIG to MSH reiterating lack of coverage under the Umbrella Policy)). Separately, by letter dated July 18, 2014, AIG advised its other insured, CarvedRock, that the AIG-CarvedRock Excess Policy, as a "follow-form" policy,[12] would not provide coverage if Burlington, the issuer of the underlying primary policy, succeeded in its arguments that (i) it had no obligation for any contractual indemnification claims in the absence of a written agreement for same and/or

---

[11]    A wrap-up policy, sometimes referred to as an owner-controlled insurance program ("OCIP") or a contractor-controlled insurance program ("CCIP"), is often used in large construction projects, and involves the developer, general contractor, and all of the subcontractors being listed as named insureds under a single policy that covers a single project.

The record contains evidence that AIG's decision to deny coverage based on the existence of a "wrap-up" policy was flawed, and both parties to this litigation have suggested that it stemmed from a mistaken belief that the Travelers OCP Policy was in fact an OCIP policy. Travelers, in particular, has ascribed significance to the fact that both parties to this litigation believed AIG to be in error. (*See generally* Def. Br. 6-7 n.7 and record cites listed therein). That said, the record is also clear that claims personnel from Travelers and Chubb/Vigilant were unable to persuade their AIG counterparts of their error. (*See, e.g.*, Swift Decl., Ex. H at V79 ("We respectfully disagree with your conclusion that the OCIP policy issued to the Zoo does not constitute a wrap-up policy or similar rating plan.")). As discussed *infra* in this Opinion, the Court does not believe that any error by AIG in this regard (a point this Court does not resolve) rendered Vigilant's conduct "voluntary."

[12]    Broadly speaking, a follow-form excess liability policy provides excess coverage subject to all of the terms and conditions of the primary policy beneath it.

(ii) coverage should be denied under the Burlington CGL Policy on a "special employer" theory.  (Swift Decl., Ex. L).[13]  What this meant as a practical matter was that, barring a change in position by AIG or Burlington, or additional litigation to resolve the coverage disputes, the Zoo had $8 million in coverage available to it for the Accident, comprising the Travelers OCP Policy (with a $2 million policy limit), the Travelers CGL Policy (with a $1 million policy limit), the Vigilant Policy (with a $1 million policy limit), and the Federal Excess Policy (with a $4 million policy limit).

On July 28, 2014, staff counsel Gary O'Donnell prepared a confidential Pretrial Report concerning the Oldread Action that was submitted to Travelers. (Chanin Decl., Ex. 6).[14]  O'Donnell reviewed the background and procedural posture of the case, the current resolution strategy (noting, in its present procedural posture, that "this is a case to settle"), the venue and judicial considerations, the anticipated proof at trial, and an evaluation of liability.  In the latter category, he included an extensive analysis, which, among other things, discussed the various bases on which coverage might (and might not) be available.

---

[13]     AIG had previously advised Travelers in September 2011 that the AIG-CarvedRock Excess Policy "may afford additional insured coverage to [the Zoo]."  (Schmidt Decl., Ex. G).

[14]     Preliminary to that report, a colleague of O'Donnell's had reviewed awards by juries in Erie County for pain and suffering given to plaintiffs with comparable injuries.  "In conclusion," counsel observed after detailing these awards, "the jury verdict search render a rough approximation closer to $3M in past and future pain and suffering on similar facts," in comparison to the $4.6 million pain and suffering component of the Demand Letter.  (Chanin Decl., Ex. 10).

At that point, Travelers decided to bring Vigilant back to the table after a five-year absence.  The next day, July 29, 2014, Gerry Doak, a Senior Claim Representative at Travelers, emailed a copy of the Demand Letter to an individual at Chubb (which managed claims for Vigilant) with the following transmittal:

> This is a [NYLL] 240 case with a $10.5M demand. Mediation is 8/8, trial in mid Sept. Erie County.  We have $2M for the Zoo on an OCP policy.  There is also $1M on the MSH policy and a $10M excess policy with AIG.  There are priority of coverage issues that need to be addressed and Chubb as the primary carrier for the Zoo needs to be part of those discussions.  I have copied in the AIG adjuster and I will send you a copy of counsel's Pretrial report.

(Swift Decl., Ex. H at Vl263; *see also* Schmidt Decl., Ex. P at 76 (Doak claim note of communications with Deborah Swift at Chubb and David Feit at AIG)). On July 30, 2014, Deborah Swift, an Assistant Vice President and Claims Regional Technician at Chubb, was assigned to handle the matter.  (Swift Decl., ¶ 27).

### 6.    The Run-Up to the August 8 Mediation

Nine days remained until the mediation.  On July 30, 2014, Swift reached out to Doak to obtain information and documents regarding the Oldread Action, including information concerning coverage; in a conversation later that day, Doak advised Swift orally of $3 million in coverage under the primary Travelers policies, but agreed to confirm this figure in writing.  (Swift Decl., Ex. H at V923 (claim note memorializing conversation)).  One week later, on August 6, 2014, Swift emailed Doak concerning a conversation that she had

had with Oldread's counsel.  (*Id.* at V732-33).  Anticipating additional
communications with Oldread's counsel, Swift sought Travelers' position
regarding priority of coverage, and offered her view that "Travelers' OCP and GL
policies must be exhausted before the primary Vigilant policy is called upon to
respond."  (*Id.* at V733; *see also id.* at V921-24 (Swift coverage analysis); Swift
Dep. 48-49 ("I concluded that after the exhaustion of the Travelers OCP and
CGL policies, to the extent that the AIG umbrella policy was not amended as
required by the contract to be primary, that Vigilant would come next.  Had the
AIG policy been amended to reflect primary and non-contributory [coverage]
where required by contract, that policy would have come next.")).  The next
day, August 7, 2014, Doak responded, "I can confirm that the OCP policy is
primary but I cannot confirm anything beyond that."  (Swift Decl., Ex. H at
V732; *see also id.* at V731 (recording second communication from Travelers to
same effect, i.e., that there was no position concerning the CGL Policy)).

　　　Swift also communicated with David Feit, the claims examiner for AIG,
addressing the AIG-MSH Umbrella Policy; he advised her on August 7, 2014,
that "the Zoo has not tendered [any claim arising from the Accident] to AIG or
MSH."  (Swift Decl., Ex. H at V727; *see also id.* at V711, V717, V724 (references
to AIG disclaiming coverage under AIG-CarvedRock Excess Policy because of
absence of tender by Chubb and excess status of AIG policy)).[15]

---

[15]　This information was repeated in a letter from AIG to Vigilant dated August 8, 2014, in
which AIG advised that there was no coverage for the Zoo under the AIG-MSH Umbrella
Policy, because (i) the policy did not apply to any liability arising under a project
insured under a "wrap-up" or any similar insurance plan, (ii) the notice of claim was

18

Later that morning, Swift emailed the following to Doak and Feit:

> It is my understanding that [the Zoo] is an additional insured under both the [Travelers' CGL Policy and the AIG-MSH Umbrella Policy], which is what was required in the contract with [MSH].
>
> Vigilant tendered the defense and indemnity of [the Zoo] to Travelers on May 15, 2009 to which Travelers agreed on May 20, 2009 under the OCP policy issued to [the Zoo] as required by its contract with [MSH]. The Travelers OCP policy is primary, however, [the Zoo] is still an insured under both the Travelers GL and AIG Umbrella policies that were issued directly to [MSH] and is entitled to coverage under both policies.
>
> Given that Travelers assumed the defense and indemnity of [the Zoo], a third-party complaint was not filed against [MSH] under which [the Zoo] could assert the appropriate claims for contractual indemnity and breach of contract for failure to procure insurance as agreed to in the contract. Clearly both the OCP and GL policies were issued by Travelers. If the position all along was that the GL policy was not going to apply in accordance with the contract, then regardless of the fact that [MSH] is Travelers['] named insured under the GL policy, a third-party complaint should have been filed against them to protect [the Zoo]'s contractual indemnity and breach of contract claims rather than putting them in a position to have to file such claims after the underlying case was either settled or tried to verdict.
>
> At a minimum, unless defense counsel was advised that the policies referenced above were going to apply to [the Zoo] on a primary and non-contributory basis as required by the contract, he should have taken measures to protect [the Zoo]'s interests and ensure that appropriate contractual indemnity and breach of contract claims were asserted.
>
> Unless this matter settles at the mediation tomorrow within the limit of the Travelers and Burlington policies,

---

late, and (iii) the primary-level insurance policies had not been exhausted. (Swift Decl., Ex. M).

measures will be have to be taken to protect [the Zoo]'s interests in terms of the contractual indemnity and breach claims.

(Swift Decl., Ex. H at V726).  Later that day, Swift sent a similar email to Doak and Feit (i) expressing concern that MSH might have obtained the required insurance coverage without proper endorsements in favor of the Zoo; (ii) requesting that counsel for the Zoo immediately file a third-party complaint for coverage against MSH; (iii) reminding Doak and Feit that a successful indemnification claim against MSH would implicate the Travelers CGL and the AIG-MSH Umbrella Policies "up to the limits of each policy"; (iv) disputing AIG's contentions of late notice; and (v) pointing out perceived errors of fact in AIG's decision to disclaim coverage based on the Travelers OCP Policy being viewed as a "wrap-up" policy.  (*Id.* at V253-54).  Separately, Swift advised counsel for Oldread that Chubb, Travelers, and AIG were "sorting out priority of coverage." (*Id.* at V718).[16]

### 7.    The Post-Mediation Settlement Efforts and Eventual Settlement

The August 8 mediation, helmed by court-appointed mediator James Morris, was unsuccessful, in large measure because of continuing disputes among the carriers concerning priority of coverage and indemnification issues. (*See generally* Swift Decl., Ex. H at V242-43 (noting then-current offer of $2.5

---

[16]    During an internal roundtable discussion with staff counsel that also took place on August 7, 2014, Travelers claims personnel identified the principal coverage issues to include "liability apportionment, special employment and priority of coverage." (Schmidt Decl., Ex. P at 81).  An attendee at the roundtable suggested that Travelers "agree to disagree on those issues and focus more on resolving the case with the plaintiff with all carriers and parties reserving their rights on all issues."  (*Id.*).

million versus then-current demand of $9.5 million), V247 (outlining coverage
positions); *see also* Ex. K (Oldread confidential mediation submission); Schmidt
Decl., Ex. P at 81-82 (Doak notes concerning mediation)).  In a file note, Swift
expressed concern that if CarvedRock's renewed motion on the "special
employer" issue were to succeed, the Zoo's potential liability might exhaust the
two Travelers Policies, the Vigilant Policy, *and* the Federal Excess Policy; in her
estimation, $5 million under the AIG-MSH Umbrella Policy might be available
of AIG could be persuaded of the error of its "wrap-up" position, though all $10
million would be available if MSH were found to be liable under a contractual
indemnity theory.  (Swift Decl., Ex. H at V242-43).  She also recorded Travelers'
positions that the CGL Policy was (i) concurrent in priority with the Vigilant
Policy and (ii) not being offered as part of the settlement.  (*Id.* at V247, V244-
45; *see also* Schmidt Decl., Ex. P at 92 (Doak notes: "I had made it clear to all
attending that I did not have any authority from the [Travelers CGL Policy] nor
could I commit that that coverage was primary.")).

Thereafter, both the mediator Morris and counsel for Oldread undertook
a form of "shuttle diplomacy" with the individual carriers.  (*See, e.g.*, Swift
Decl., Ex. H at V148-50, V242-43, V246).  Separate from their efforts, Swift
emailed Doak and O'Donnell on August 11, 2014, to see if Travelers would
contribute any money from the CGL Policy, and discussed the possibility of an
action against AIG to recover the Vigilant policy limit.  (*Id.* at V176-77).  In that
communication, Swift inquired into the appointment of a claims examiner for
MSH (on the theory that Doak's work was on behalf of the Zoo), and the filing

of the third-party complaint against MSH.  Doak responded later that day that
"[n]o decision has been made" on the Travelers CGL Policy.  (*Id.* at V175).  Swift
in turn reminded him that if the CGL Policy "isn't offered, we [Vigilant] aren't
putting up our primary.  It has to be both." (*Id.*).  Doak confirmed that he
"[u]nderstood." (*Id.*).

On August 14, 2014, O'Donnell advised the Zoo of developments in the
Oldread Action.  (Swift Decl., Ex. H at V170-71).  Of potential significance to
the instant motion, O'Donnell related that:

- "[V]ery little progress" had been made during the August
  8 mediation because of "unresolved liability issues and
  differences of opinion among the parties as to insurance
  coverage primary and sharing";

- Judge Bannister's April 2014 resolution of the summary
  judgment motions had left open the issue of whether the
  Zoo could recover against CarvedRock in indemnity;

- O'Donnell's firm was defending the Zoo on the Travelers
  OCP policy only.  While the firm believed that the Zoo was
  an additional insured on the Travelers CGL and the AIG-
  MSH Umbrella Policies, "Travelers has not committed this
  additional $1M [CGL] policy to a settlement of the case,"
  and AIG had in fact disclaimed coverage under the
  Umbrella Policy;[17]

- The Zoo had its own excess coverage under the Vigilant
  and Federal Policies; and

- While staff counsel was working to avoid the Zoo being
  assessed with an individual financial obligation, "it has
  recently become apparent that the Travelers $2M OCP
  policy ... will not be sufficient to resolve this case and that
  additional contributions will be necessary either from
  Travelers, AIG and/or CarvedRock's insurers."

---

[17]    *Cf.* O'Donnell Dep. 187: "Even at this time it was my belief that one million on the MSH
[CGL] policy was still available. I thought Gerry [Doak] just had to get permission to
release it. That was my understanding."

(*Id.*).

From August 15 through August 21, 2014, representatives of the affected carriers continued to discuss the parameters of a global resolution to meet Oldread's demand, then $9.3 million and later reduced to $8.3 million.  (*See, e.g.*, V144-47).  Emails between and among Swift, Doak, Feit, and O'Donnell reflected that Burlington was willing to contribute $1 million, AIG was willing to contribute $1 million, and AIG was open to releasing additional funds under the AIG-CarvedRock Excess Policy on a 50-50 basis to match funds contributed by Travelers and/or Chubb.  (*Id.* at V144; *see also id.* at V136).  O'Donnell also responded to Swift's request for a third-party complaint against MSH with an August 18, 2014 email outlining his strategic decisions for not filing such an action.  (*Id.* at V138-39; *but cf.* Chanin Opp. Decl., Ex. E (discussing staff counsel's inability to bring a claim against MSH because of conflict issues occasioned by prior representation of MSH)).

During this same time period, Doak prepared a Construction Large Loss Report (the "CLLR"), dated August 19, 2014, for internal dissemination within Travelers.  (*See* Chanin Decl., Ex. 7; Doak Dep. 159-62).  In the "Coverage" section of the CLLR, Doak noted, among other things, that (i) coverage was afforded under the Travelers OCP Policy, which was primary and non-contributory to the Travelers CGL Policy; (ii) the CGL Policy claim file was closed, but Doak had confirmed that the Zoo had been listed as an additional insured on the policy; and thus (iii) the CGL Policy would be "next in line for the coverage for the Zoo."  (Chanin Decl., Ex. 7 at T72; *see also id.* ("Travelers

provides the next layer of coverage under the GL policy issued to MSH where the Zoo is named as an additional insured, … which carries a $1M limit.")).

Despite Doak's definitive internal coverage analysis, Swift's efforts to obtain clarity on this issue from him were singularly unavailing. (*See, e.g.*, Swift Decl., Ex. H at V78, V80). Doak continued to demur to Swift concerning the priority of coverage of the Travelers CGL Policy. (*Id.* at V144 (making "no commitment" on the Travelers CGL Policy); *see also id.* at V132 (memorializing Swift request to Doak on priority of coverage; noting adjournment of pretrial conference "because all parties are waiting for Travelers to make a decision on the $1 million [Travelers CGL Policy]"; and recording Doak's comment that decision was "above [his] pay band")). And Feit continued to take the position that the MSH-AIG Umbrella Policy applied, if at all, after the Vigilant Policy. (*Id.* at V79). In consequence, Swift reiterated her request for a third-party complaint to be filed against MSH. (*Id.* at V74-75; *see also* Schmidt Decl., Ex. P at 94).

Doak responded to Swift's email on August 25, 2014. (Swift Decl., Ex. H at V74). He related Travelers' view that "$4M is enough for this case and that any additional money should come from AIG/Carved Rock" (*id.*); he remained silent on the priority *vel non* of the CGL Policy (*id.* at V68).[18] Doak further

---

[18]    At an internal roundtable discussion at Travelers on August 21, 2014, Doak had argued for some contribution from the Travelers CGL Policy, since Chubb was offering to match any such contributions with contributions from the Vigilant Policy. His arguments were rejected by the other attendees, who believed that the $2 million offered under the OCP Policy was more than adequate. (Doak Dep. 73-74). At the same meeting, Doak suggested acknowledging Travelers' primacy of coverage. This issue, however, was not resolved. (*Id.* at 75 ("Once we determined that the amount of money that we had offered sufficiently covered the zoo's exposure, the issue was never fully fleshed out."); *see also*

noted that staff counsel for the Zoo was being replaced because of a conflict.

(*Id.* at V74; *see also id.* at V69-70).  The new counsel was Joseph Matteliano.

(*Id.* at V69-70).

That same day, Swift delineated her concerns about the litigation

positions of her Travelers and AIG counterparts:

> I do not disagree with you regarding the need for AIG to resolve this for the additional amount needed under the [AIG-CarvedRock Excess Policy], but the fact remains, at this point, they are only willing to concede to a 50/50 split based on the direct [NYLL § 240] claims.  By taking its current position, Travelers is running the risk of losing Burlington and AIG's contributions under the Carved Rock policies should they succeed on the special employee motion.  In doing so, the [Vigilant and Federal Excess Policies] for the Zoo will be exposed if a damages award exceeds the $2M [Travelers OCP] and $1M [Travelers CGL] policies.  Further, and more importantly, given that the total coverage available to the Zoo is at most $8 million (not including AIG's excess policy given their coverage disclaimer which remains disputed) by allowing this case to proceed to trial, Travelers is putting the Zoo in a position in which it is at risk of exposure beyond available policy limits.
>
> We also need to discuss the priority of coverage issue unless Travelers will agree that to the extent that a damages award exceeds the current offer the [Travelers CGL] policy will apply on a primary and non-contributory basis before the Vigilant policy.

(*Id.* at V55).

Later that morning, Swift was contacted by Feit at AIG to discuss, among

other things, "Travelers['] sudden refusal to offer any additional money."  (Swift

---

id. at 77 ("We never told Chubb we provided primary coverage on the [Travelers CGL Policy] because we felt the contribution on behalf of the zoo was more than adequate to cover their exposure.")).

Decl., Ex. H at V52).  She was also contacted by counsel for Oldread, who advised her of (i) a settlement conference scheduled for the following day and (ii) counsel's belief that the intransigence of AIG and Travelers was blocking settlement of the matter.  (*Id.* at V49-50).  That afternoon, Swift participated in a conference call with Doak, Feit, and Matteliano, to discuss trial and settlement strategies.  (*Id.* at V47).  Again — and despite vocal opposition from AIG and Vigilant — Travelers refused to put up money from the CGL Policy, even though AIG agreed to match any such money.  (*Id.*).  And again, Swift discussed a third-party indemnification action against MSH that would be designed to get around AIG's arguments disclaiming coverage under the AIG-MSH Umbrella Policy.  (*Id.* at V44-45).

Swift, Doak, and Feit learned on August 27, 2014, that a second settlement conference in the Oldread Action had failed.  (Swift Decl., Ex. H at V35).  Swift asked Doak whether Travelers would offer anything beyond the $2 million limit on the OCP Policy; Doak answered in the negative.  (*Id.* at V34).  In response, Swift advised that, to protect the Zoo, Vigilant might "settle this without them and sue them after the fact to recover what's been paid under the Vigilant policy."  (*Id.* at V38).  As a final compromise, Swift offered to match contributions from the Vigilant Policy and the Travelers CGL Policy on a 50-50 basis, but Travelers refused.  (*Id.*).

Swift participated in discussions on August 28 with counsel for Oldread, with a second AIG claims representative, and with mediator Morris (who related, among other things, that he had been contacted by the trial judge

regarding her desire for a settlement in the neighborhood of $5 million).  (Swift Decl., Ex. H at V29-31, V38-39).  The product of the many discussions between and among carriers was a settlement of $5.3 million, comprising $2 million from the Travelers OCP Policy, $1 million from Burlington, $1.65 million from AIG, and $650,000 from Vigilant.

On August 29, 2014, attorney Joseph Matteliano appeared on behalf of the Zoo with others before Judge Bannister in order to place on the record the settlement in the matter.  (*See* Chanin Opp. Decl., Ex. A).  That same day, Swift advised Doak of the settlement, and requested confirmation that Travelers would reimburse Vigilant for the Payment.  (Swift Decl., Ex. H at V25).  Two weeks later, on September 10, 2014, Doak responded with Travelers' position that the $650,000 paid by Vigilant was a "voluntary payment."  (*Id.* at 21).

**B.      Procedural History**

Vigilant filed an action for declaratory relief in New York State Supreme Court, New York County, on December 12, 2014.  (Dkt. #1).  The matter was removed to this Court on January 8, 2015.  (*Id.*).  After an extensive period of discovery, the parties filed cross-motions for summary judgment on March 14, 2016.  (Dkt. #45-46).  Opposition memoranda were filed on April 13, 2016 (Dkt. #56, 61), and briefing concluded with the filing of reply memoranda on April 28, 2016 (Dkt. #69-70).

## DISCUSSION

### A.    Summary Judgment Under Fed. R. Civ. P. 56

Rule 56(a) instructs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[19] "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Pace* v. *Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 262 (S.D.N.Y. 2016) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)). And where, as here, "'parties file[ ] cross-motions for summary judgment[,] ... each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d

---

[19]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). As of this past year, the Second Circuit continues to use both formulations. *Compare, e.g., Smith* v. *Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) ("The moving party bears the burden to demonstrate the absence of any genuine issues of material fact."), *with, e.g., Harris* v. *Miller*, 818 F.3d 49, 54 (2d Cir. 2016) ("[W]e conclude that there are genuine disputes of material fact[.]"). Indeed, the Circuit sometimes uses the terms interchangeably within the same decision. *Compare, e.g., Cross Commerce Media, Inc.* v. *Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) ("[T]here is a genuine dispute of material fact[.]"), *with, e.g., id.* at 168 ("We therefore think that [the nonmovant] has raised a genuine issue of material fact[.]"). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent.

620, 631 n.12 (2d Cir. 2016) (quoting *Morales* v. *Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

Thus, "[a] motion for summary judgment may properly be granted … only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor* v. *Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010)).  In determining whether summary judgment is merited, "[t]he role of a court … is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *NEM Re Receivables, LLC* v. *Fortress Re, Inc.*, 173 F. Supp. 3d 1, 5 (S.D.N.Y.) (internal quotation mark and citation omitted), *reconsideration denied,* 187 F. Supp. 3d 390 (S.D.N.Y. 2016).

A party moving for summary judgment "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp.* v. *Nordic Tankers Trading A/S*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)).  "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  And "[a] dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Fireman's Fund Ins. Co.*, 822 F.3d at 631 n.12 (quoting *Anderson*, 477 U.S. at 248).

If the movant satisfies its initial burden, then "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and citation omitted).  To make this showing, a summary-judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, that opponent must adduce "evidence on which the jury could reasonably find for" him.  *Anderson*, 477 U.S. at 252.

**B.   Analysis**

**1.   Overview**

One consequence of bringing this lawsuit is that Vigilant has obtained the clarification it sought throughout July and August of 2014:  Travelers acknowledges not merely that the Zoo was subject to coverage over the Travelers OCP and CGL Policies, but that the latter policy had priority of coverage vis-à-vis the Vigilant Policy.  (*See* Def. Br. 4 ("Travelers does not dispute that as between those two policies the Travelers CGL policy is primary and non-contributory.")).  Accordingly, the Court will not engage in the coverage analysis that was initially sought in Vigilant's complaint, but will rather accept, as given, the facts that (i) the Zoo was subject to coverage under all three policies, and (ii) the two Travelers policies had primacy of coverage to the Vigilant Policy.

The parties' summary judgment motions are two sides of the same coverage coin.  To Travelers, the $650,000 contribution from Vigilant that

sealed the Oldread settlement deal was both voluntary and unreasonable in relation to the value of the case. Travelers posits various sources of coverage that were available to the Zoo and that would have more than adequately covered the true settlement value (and even the actual settlement value) of the Oldread Action. Vigilant presses the antipodal view: Travelers' unjustified refusal to take a position on the priority *vel non* of its CGL Policy, and its related decision to offer only the policy limits of the OCP Policy, compelled Vigilant to offer a substantial portion of the policy limits of the Vigilant Policy, lest Vigilant and the Zoo be subjected to a substantially higher damages award after trial.

New York insurance law is not perfectly consistent on equitable subrogation and the voluntary payment doctrine. However, after considering the relevant cases and the facts confronting Vigilant when it made its decision to contribute to the Oldread settlement, the Court is confident that no reasonable jury could find that Vigilant's payment was voluntary. Less clear, however, is the issue of reasonableness: While Vigilant offers many reasons why the settlement figure (and, more specifically, its contribution to that figure) was reasonable, the contemporaneous documents and certain testimony proffered in this litigation raise a genuine dispute of material fact as to reasonableness.

### 2. The Voluntary Payment Doctrine and Equitable Subrogation Under New York Law

The parties agree that New York law governs. (*See* Pl. Br. 18-21; Def. Br. 17-21, 23). More than a century ago, the New York Court of Appeals found

that "[a] mere volunteer or intermeddler will not be substituted in the place of a person whose rights he seeks to acquire, simply because he has paid a debt, or discharged an obligation, for which that person was responsible." *Koehler* v. *Hughes*, 148 N.Y. 507, 511 (1896). The voluntary payment doctrine thus "bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law." *Dillon* v. *U-A Columbia Cablevision of Westchester*, 100 N.Y.2d 525, 526 (2003); *see generally* 23 N.Y. JUR. 2D, *Contribution, Indemnity, and Subrogation* § 174 (Feb. 2017).

The voluntary payment doctrine also places a significant limit on the doctrine of equitable subrogation, which provides generally that "where the 'property of one person is used in discharging an obligation owed by another or a lien upon the property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.'" *First Franklin Fin. Corp.* v. *Beniaminov*, 42 N.Y.S.3d 46, 48 (2d Dep't 2016) (quoting *King* v. *Pelkofski*, 20 N.Y.2d 326, 333 (1967) (internal quotation marks omitted in *King*)). In particular, "[a]n insurer which pays a loss for which it is not liable thereby becomes a mere volunteer, and is not entitled to subrogation, in the absence of an agreement therefor." *Nat'l Union Fire Ins. Co.* v. *Ranger Ins. Co.*, 599 N.Y.S.2d 347, 348-49 (4th Dep't 1993) (quoting 16 COUCH ON INSURANCE 2D § 61:55, at 137-38 (rev. ed.)) (collecting cases) (alteration added); *see also Koehler*, 148 N.Y. at 511 ("One cannot ask for subrogation with

success, unless either he or his property was in some way lawfully answerable for the claim paid[.]").[20]

The Second Department has discussed the interplay of the voluntary payment and equitable subrogation doctrines:

> The equitable doctrine of subrogation "is 'applicable to cases where a party is compelled to pay the debt of a third person to protect his own rights, or to save his own property'" (*Gerseta Corp.* v. *Equitable Trust Co. of N.Y.*, 241 N.Y. 418, 426, 150 N.E. 501 [(1926)], quoting *Cole* v. *Malcolm*, 66 N.Y. 363, 366 [(1876)]). However, while the scope of subrogation is broad, it cannot be invoked where the payments sought to be recovered are voluntary (*see Bermuda Trust Co.* v. *Ameropan Oil Corp.*, 266 A.D.2d 251, 698 N.Y.S.2d 691 [(1999)]; *Cohn* v. *Rothman-Goodman Mgt. Corp.*, 155 A.D.2d 579, 580, 547 N.Y.S.2d 881 [(1989)]). A party seeking subrogation can establish that its payments were not voluntary either by pointing to a contractual obligation (*see Hamlet at Willow Cr. Dev. Co., LLC* v. *Northeast Land Dev. Corp.*, 64 A.D.3d 85, 106, 878 N.Y.S.2d 97 [(2009)]) or to the need to protect its own legal or economic interests (*see Gerseta Corp.* v. *Equitable Trust Co. of N.Y.*, 241 N.Y. at 426, 150 N.E. 501). When invoking the latter ground, however, the party seeking subrogation must show that the act is not merely helpful but necessary to the protection of its interests (*see Cohn* v. *Rothman-Goodman Mgt. Corp.*, 155 A.D.2d at 580, 547 N.Y.S.2d 881).

*Broadway Houston Mack Dev., LLC* v. *Kohl*, 897 N.Y.S.2d 505, 506 (2d Dep't 2010); *see also Markel Ins. Co.* v. *Am. Guarantee & Liab. Ins. Co.*, 974 N.Y.S.2d 569, 572 (2d Dep't 2013).

---

[20]    A leading treatise on insurance law observes that it may be more appropriate to refer to an insurer's right to recover the payments from another insurer that covered the risk as "contribution" instead of subrogation. Steven Plitt *et al.*, 16 COUCH ON INS. § 222:2 (3d ed.) (hereinafter, "COUCH"). However, since the case law does not always make this distinction, the Court will use equitable subrogation to refer both to actions by an insurer against a third party responsible for a loss and to those by one insurer against another.

Equitable subrogation cases involving one insurer seeking recovery from another are few and fact-dependent.  In some cases, the rationale for concluding that a payment was voluntary seems obvious, as where the insurer made a payment for a risk not covered by its policy or in excess of policy limits. *See, e.g.*, *Gov't Emp. Ins. Co.* v. *RLI Ins. Co.*, 20 N.Y.S.3d 411, 412-13 (2d Dep't 2015) (rejecting effort by primary carrier to recover settlement payment in excess of its policy limits from excess carrier, concluding that payment was voluntary); *Ranger Ins. Co.*, 599 N.Y.S.2d at 348 ("Because National was not obligated under its policy of insurance, it became a volunteer with no right to recover the monies it paid on behalf of its insured."); *see also Merchants Mut. Ins. Grp.* v. *Travelers Ins. Co.*, 806 N.Y.S.2d 813, 815-16 (4th Dep't 2005) (concluding that an insurer who assumed the defense and indemnification of an insured when there was no obligation to do so was not entitled to recover monies paid out on that insured's behalf, absent a showing that insured was acting under a "mistake of material fact or law"); *Travelers Ins. Co.* v. *Nory Constr. Co.*, 708 N.Y.S.2d 252, 254-44 (Sup. Ct. Monroe Cty. 2000) (finding, in action by insurer against third-party contractor, payments in excess of acknowledged coverage limits to be voluntary); *cf. Liberty Mut. Ins. Co.* v. *Fireman's Fund Ins. Cos.*, 529 N.Y.S.2d 956, 957-58 (Sup. Ct. Nassau Cty. 1988) (rejecting voluntariness challenge based on comparative knowledge, concluding in relevant part that "Federal, at the time of settlement, did not 'know' that Atlantic's excess coverage was first tier, and, thus would not be applied pro rata with Federal's").

Other decisions have focused on whether the insurer's payment was truly "voluntary." *See, e.g.*, *Royal Indem. Co.* v. *Wyckoff Heights Hosp.*, 953 F. Supp. 460, 466-67 (S.D.N.Y. 1996) ("Royal had a legitimate interest for making the payment, as settlement of the state court action was valued at $3 million and a jury could have reasonably returned liability up to $8 million, thereby exposing Royal to significant liability under the Policy.  Thus, Royal is not a volunteer and is not precluded from reimbursement." (internal citations omitted)); *Admiral Ins. Co.* v. *Am. Empire Surplus Lines Ins. Co.*, 947 N.Y.S.2d 442, 444-46 (1st Dep't 2012) (rejecting efforts by subcontractor's primary carrier to avoid settlement payment made by contractor's excess carrier based on "voluntary payments" clause of primary carrier's policy); *U.S. Fire Ins. Co.* v. *CNA & Transcon. Ins. Co.*, 752 N.Y.S.2d 765, 766-67 (4th Dep't 2002) (finding that payment by excess carrier was not voluntary where made after primary carriers refused to pay into settlement); *Merchants Ins. Grp.* v. *Estate of Geralis*, 803 N.Y.S.2d 19 (table), 2005 WL 1704129, at *3 (Sup. Ct. Suffolk Cty. May 10, 2005) ("It has not been disputed that Progressive settled the underlying claims against Geralis, within the policy limits, to protect its insured, who would have been defenseless based upon State Farm's denial of coverage and disclaimer of liability.  By settling the claim of the other vehicle's driver for less than the policy limits, Progressive also served the interests of both itself and State Farm, who never objected to the terms of the settlements.  Under these

circumstances, Progressive's payment was not voluntary, and Progressive has a right of equitable subrogation against State Farm.").[21]

### 3.   Vigilant's Contribution to the Oldread Settlement Was Not Voluntary

The Court agrees that

> [f]or purposes of the rule that an insurer's payment to an insured must be made under obligation rather than as a volunteer in order for the insurer to become subrogated, public policy supports a narrow interpretation of the insurer's "volunteer" status [and thus] a liberal application in favor of finding that the insurer who pays is entitled to subrogation.

COUCH, § 223:26.  It thus considers what Vigilant knew at the time it contributed to the Oldread settlement against this public policy backdrop.

On July 29, 2014, when Chubb was invited by Gerry Doak at Travelers to address "priority of coverage issues" (Swift Decl., Ex. H at V1263), the possibility that the Zoo would be hit with a damages award that exhausted its existing coverage was very real.  The Oldreads and their counsel had presented meticulous backup for the $10.5 million settlement figure they proposed, and Oldread's then-present and continuing medical issues — as well as their causal connection to the Accident — were beyond credible dispute.[22]  Deborah Swift

---

[21]   A separate body of law pertains to bad-faith refusals by a primary carrier to settle a claim within applicable policy limits, thereby subjecting an excess carrier to liability. *See, e.g.*, *St. Paul Fire & Marine Ins. Co.* v. *U.S. Fid. & Guar. Co.*, 43 N.Y.2d 977, 978-79 (1978); *Hartford Acc. & Indem. Co.* v. *Mich. Mut. Ins. Co.*, 462 N.Y.S.2d 175, 178 (1st Dep't 1983), *aff'd*, 61 N.Y.2d 569 (1984).  No such claim is raised by Vigilant in this case.

[22]   Countering this evidence was the defense argument that these injuries were the product of pre-existing conditions, an argument made principally through the testimony of Dr. David Hootnick.  However, Dr. Hootnick's testimony existed in tension with other defense experts, including defense vocational expert Alan Winship.  (*See* Schmidt Decl., Ex. P at 67 (Doak claim note: "We [internal Travelers personnel and staff counsel Gary O'Donnell] discussed the fact that we are left with the experts that the [co-defendant]

had come on board a mere nine days before a court-ordered mediation, and the September trial date loomed.  The Zoo had already been found liable under the NYLL, and there was no guarantee that a jury would accept its arguments that CarvedRock was not Oldread's "special employer," that CarvedRock was actually to blame for Oldread's injuries, or that Oldread's injuries were not as severe as he claimed.

At the same time, decisions in two separate litigations were narrowing the Zoo's bases for additional coverage.  Judge Arcara in the Western District of New York had adopted Judge Schroeder's finding that the Zoo was not an additional insured on the Burlington CGL Policy issued to CarvedRock, and the Zoo's counsel had elected not to appeal that decision.  Burlington, as it turns out, had also included an endorsement on the Burlington CGL Policy that changed the definition of "insured contract" to exclude the subcontract between MSH and CarvedRock; as a result, Travelers concluded, "if we [the Zoo] get awarded contractual indemnity from CarvedRock, Burlington won't cover that exposure." (Chanin Decl., Ex. 7 at T74)  And as a third concern involving CarvedRock, Judge Bannister had left open the possibility of

---

retained, Hootnick for the orthopedic IME and Winship for the [vocational rehabilitation].  Hootnick says the injuries are not at all related to the accident while Winship states that the plaintiff has absolute[ly] no working capacity.").  Given the undisputed evidence that Oldread fell from a scaffolding, and the fact that his injuries correlated with such a fall, Travelers and staff counsel understandably considered not calling Dr. Hootnick as a witness at trial, even if that resulted in an adverse inference charge.  (*See id.* at 83 ("Gary [O'Donnell] and I discussed the possibility of NOT calling Hootnick and Winship and taking the missing witness charges which means that the judge will instruct the jury that the defense is not calling these witnesses and it can be assumed that they'd be negative for the defense. ... [Gary] claims it would inflame the jury for Hootnick to express his opinions when all other doctors support the plaintiff.")).

revisiting her decision on the special employer issue.  (*See* Schmidt Decl., Ex. C at 16; Chanin Decl., Ex. 3 (renewed motion)).  Travelers expressed concern that "[CarvedRock] may have a valid defense under [Workers' Compensation] exclusivity as the special employer and though we have a valid third party claim against them, they are out of business and there is no coverage for the contractual indemnity exposure." (Chanin Decl., Ex. 7 at T74).  If CarvedRock won the special employer motion, the Zoo would lose the ability to bring a common-law indemnity claim against it.

There was also considerable uncertainty concerning coverage available under the AIG policies issued to MSH and CarvedRock.  Given the resolution of the WDNY Coverage Action, the AIG-Carved Rock Excess Policy appeared no longer to be an option.  Nor was there any certainty in coverage for the Zoo as an additional insured under the AIG-MSH Umbrella Policy.  To be sure, both Travelers and Vigilant were confident that AIG had merely confused the OCP Policy with an OCIP/wrap-up policy.  However, David Feit of AIG had professed equal confidence in AIG's position that the OCP was itself a "wrap-up policy or similar rating plan." (Swift Decl., Ex. H at V79).  And with respect to coverage for the Zoo under the AIG-MSH Umbrella Policy via an indemnification lawsuit against MSH, no matter how "indisputable" an argument the Zoo had, no action had been filed in the five years since the filing of the Oldread Action. Here, too, the Court understands that this inaction was in part a strategic decision to keep MSH "in the tent" with the Zoo, and focus on obtaining

coverage from CarvedRock.[23]  However, that gambit had failed in the Western District of New York, and seemed likely to fail if the renewed special employment motions were decided in Erie County Supreme Court.  In any event, with trial a few weeks away, the Zoo (and, by extension, Vigilant), could have no assurance that a judge or arbitrator would later find in their favor with respect to coverage under the AIG-MSH Umbrella Policy.

Deborah Swift — understandably, properly, and repeatedly — sought information from Travelers concerning priority of coverage.  Her contemporaneous communications, internally and with others whose policies were implicated by the Oldread Action, are consistent in their expressions of concern that the Zoo was facing a damages award that exceeded applicable policy limits.  (*See, e.g.,* Swift Decl., Ex. H at V54-55, V728).  But Doak and Travelers repeatedly refused to commit on this issue, and on the current record, the only conclusion that can be drawn is that they did so in order to perpetuate a state of coverage uncertainty, one that would force Vigilant to contribute from its policy in order to settle the matter and forestall the possibility of a larger damages award post-trial — what this Court has earlier in this Opinion termed a game of chicken.[24]

---

23      In part, it was also the product of staff counsel's conflict of interest.

24      *See also* Schmidt Decl., Ex. P at 91-92 (Doak claim note of August 13, 2014 internal Travelers meeting)):

> We all agree that the [Travelers CGL Policy] policy should apply after the OCP based on the primary additional insurance and the excess language in the [Vigilant Policy].  A real big question here is the value of the case and on this I have asked counsel to weigh in. We will need to consider the best strategy before we agree to put the additional money in play.  I have confirmed that we have advised Chubb that the Zoo is an additional insured on [the

Travelers is of course correct that Swift had the ability to perform her own coverage analysis (*see, e.g.*, Def. Opp. 27), and indeed, Swift had correctly determined that the Travelers CGL Policy was second in line (Swift Dep. 48-49). However, Travelers had also concluded that the CGL Policy was second in line, and had no reason not to share that information with Vigilant under these circumstances.  What is more, despite this conclusion, Travelers refused to commit *any* of the CGL Policy to the settlement of the case; the portion of the settlement that it did pay was the policy limits on the OCP Policy.  (*See* Swift Decl., Ex. H at V21 (Doak email confirming that Travelers ultimately put up "the full $2M limits of the OCP policy"); *see also* Def. 56.1 ¶ 15 (stating that the Zoo's defense costs in the Oldread Action were paid under the Travelers OCP Policy)).

For this reason, Travelers' current suggestion that it was not required to disclose its views concerning the primacy of the Travelers CGL Policy because it was never going to contribute more than the policy limits on the OCP Policy towards the settlement (*see* Doak Dep. 60-61), is both contradicted by its staff counsel (*see* O'Donnell Dep. 187) and irrelevant.  Travelers never stated to Chubb/Vigilant that it was acknowledging priority of coverage under the CGL Policy and yet standing firm at a $2 million contribution figure.  Instead, for all intents and purposes, Travelers disclaimed coverage under the CGL Policy. Because Chubb stepped in to protect its own interests and that of its insured,

---

Travelers CGL Policy] BUT have not committed any $$ nor have I agreed on priority of coverage.

as required by the Vigilant and Federal Excess Policies, it cannot be said to have acted as a volunteer.[25]

The Court finds support for its conclusion in several decisions from New York state courts.  One is the First Department's decision in *Admiral Insurance Company* v. *American Empire Surplus Lines Insurance Company*, 947 N.Y.S.2d 442 (1st Dep't 2012).  As with most insurance coverage actions, understanding the decision requires an understanding of the procedural history of the underlying personal injury action.  Here, an employee of a subcontractor on a Manhattan construction project was injured at the job site and sued the general contractor on the project.  *Id.* at 444.  The subcontractor-employer was not brought into the action, even as a third-party defendant.  The jury found the contractor to be solely liable for the injuries and, during the damages phase of the trial, the primary carrier for the general contractor and the subcontractor ("AEI"), as well as the excess carrier for the general contractor ("Admiral"), settled the matter for $2.3 million, with Admiral contributing $866,887 while reserving its rights to seek contribution from AEI and from the subcontractor's excess carrier (Scottsdale Insurance Company, or "Scottsdale").  *Id.*

---

[25]   Even with the CGL Policy limits of $1 million, the Zoo would be left with only $8 million in coverage against a $10.5 million settlement demand from the Oldreads. With no confidence that the AIG-MSH Umbrella Policy would be available in the future, and with it certainly not available at that time, Chubb had every reason to be concerned even had Travelers offered to contribute the CGL Policy limit of $1 million. These facts, among others, made the Payment not voluntary for Vigilant; Travelers' now-acknowledged priority of coverage with respect to the Travelers CGL Policy made the Payment, assuming it was reasonable, obligatory for Travelers.

In the subsequent coverage action, Admiral argued that AEI should have contributed the $2 million limits on its primary policy, and that Scottsdale should have contributed the remainder because the general contractor was an additional insured on the subcontractor's policy.  947 N.Y.S.2d at 444. Scottsdale moved for summary judgment declaring that it had no obligation to contribute to the settlement, and Admiral and AEI cross-moved, with the former seeking recovery of its contribution and the latter seeking from Admiral the money it had paid in excess of its policy limits.  *Id.* at 445.  The trial court granted Scottsdale's motion, denied Admiral's motion, and granted in part AEI's motion.  On appeal, the First Department effectively decided the motions in reverse, denying Scottsdale's and AEI's motions in their entirety and granting Admiral's motion to recover a portion of its contribution from both Scottsdale and AEI.  *Id.*

After finding that the general contractor was an additional insured under the AEI and Scottsdale policies, the First Department considered whether the general contractor's liability constituted liability "arising out of" the operations of the subcontractor.  947 N.Y.S.2d at 445-46.  Answering that question in the affirmative, the court found that AEI should have contributed the entirety of its $2 million primary policy limits, and that Admiral and Scottsdale should share ratably in the remaining $600,000, since both were excess carriers whose "other insurance" provisions cancelled each other out.  *Id.* at 446-47.

Of note here, the First Department rejected Scottsdale's contention that Admiral's contribution was voluntary:

> In particular, because Admiral is entitled to equitable
> contribution in its own right, without regard to being
> subrogated to any rights of its insured, the "voluntary
> payments" clause of the Scottsdale policy does not bar
> Admiral's recovery.  Nor was Admiral's participation in
> the settlement voluntary so as to preclude it from
> seeking contribution.  The loss plainly fell within the
> scope of Admiral's coverage of [the general contractor],
> and Admiral was obligated to indemnify [the general
> contractor] for the portion of the settlement amount for
> which it now seeks reimbursement from Scottsdale, i.e.,
> the amount in excess of AEI's primary coverage.

947 N.Y.S.2d at 447.  Finally, the court found no material factual disputes

concerning the reasonableness of the underlying settlement.  *Id.*

A similar result obtained in the Fourth Department in *United States First*

*Insurance Company* v. *CNA and Transcontinental Insurance Company*, 752

N.Y.S.2d 765 (4th Dep't 2002).  This, too, was a coverage action that was filed

after the resolution of a personal injury action.  In the underlying personal

injury action, the employee of a subcontractor sued the general contractor after

a job-site accident; the general contractor then commenced a third-party action

against the subcontractor.  *Id.* at 766.  After the trial court granted a motion for

partial summary judgment on the issue of liability, the case settled for

$1,500,000, contributed by the primary and excess insurers for the general

contractor.  *Id.*  The subcontractor had successfully obtained summary

judgment on its contractual indemnity claim, but the trial court had permitted

the general contractor to amend the pleading to include a claim for common-

law indemnification.  *Id.*

The Fourth Department upheld the trial court's determination that the subcontractor's primary carrier was liable for contribution, and specifically rejected a claim of voluntariness:

> We reject defendants' contention that plaintiff voluntarily participated in the settlement of the underlying action and thus no subrogation rights accrued to plaintiff. Pursuant to the terms of the insurance policy issued by plaintiff, plaintiff's obligation to defend [the general contractor] in the underlying action arose when the coverage under [the general contractor's] policy issued by North River and other insurance from defendants was exhausted. The coverage under the policy issued by North River was exhausted with its $1,000,000 payment toward the settlement *and defendants refused to pay into the settlement, thus giving rise to plaintiff's obligation to pay the remaining $500,000.* "Plaintiff did not act as a mere volunteer in providing its insured with a defense and paying the [settlement], for it did so only after defendant[s] refused [to pay]."

752 N.Y.S.2d at 766-67 (emphasis added) (internal citations omitted).

As but one more example, a trial judge in New York State Supreme Court, Nassau County, rejected a claim of voluntariness in a coverage action addressing priority of coverage among one primary and two excess carriers. *Liberty Mut. Ins. Co.*, 529 N.Y.S.2d 956. After reviewing the policies, the court concluded that Liberty Mutual was the primary carrier, Atlantic Mutual was the first-tier excess carrier, and Federal was the final-tier excess carrier. *Id.* at 956. As such, the court found that Atlantic Mutual was not liable in contribution to Liberty Mutual, but was liable in contribution to Federal:

> In the underlying action, the plaintiff suffered loss of a leg, and the Appellate Division had ordered a new trial after reversing a defendant's verdict. Under such circumstances, there can be no argument that a

44

> settlement for $350,000 was not reasonable, or that Federal was not facing some risk. A 100% plaintiff's verdict was a clear possibility where the defendant backed out of a driveway and struck plaintiff's motorcycle. A verdict of $2 million was also possible where the plaintiff suffered loss of his leg. Indeed, the Justice presiding in the personal injury action indicated that a 50% liability finding could result in a million dollar award for the plaintiff. Furthermore, Federal, at the time of settlement, did not "know" that Atlantic's excess coverage was first tier and, thus would not be applied pro rata with Federal's. Atlantic did not admit second tier coverage ahead of Federal until this motion for summary judgment. Accordingly, the court finds that Federal has met its burden of showing that it is entitled to judgment for $100,000 as a matter of law.

*Id.* at 957-58; *cf. Royal Indem. Co.*, 953 F. Supp. at 464, 466-67 (rejecting voluntariness argument where insured refused to pay full amount of its self-insured retention, and insurer stepped in so as "not to upset the negotiated settlement and risk a larger jury award" that would have exposed carrier to significant liability under the policy). So too here.

Travelers offers other arguments in favor of voluntariness, but none can succeed on this record. Several of these arguments are predicated on the fact that Travelers had a duty to defend and pay the costs of defending the Zoo, which duty Travelers argues carried with it a concomitant right to control the Zoo's defense, including any settlement offers made on the Zoo's behalf. (*See* Def. Br. 4, 16, 18-19; Def. Opp. 5; Def. Reply 2-4, 6). From this premise, Travelers argues that (i) its invitation to Swift on July 29, 2014, was only to participate in discussions concerning priority of coverage; (ii) Swift acted inappropriately in involving herself in settlement discussions with non-Travelers representatives; (iii) any contributions from Chubb/Vigilant were in

derogation of Travelers' litigation strategy and thus necessarily voluntary.
From a legal perspective, these arguments fail, as made clear in the New York
State cases just discussed.  And Travelers lacks support for any contention
that its right to defend the Zoo permitted Travelers to exclude all other carriers
from participating in the litigation, particularly when it tendered the policy
limits of one policy while refusing to commit to priority of coverage on the
second.[26]

Travelers' arguments are flawed factually as well.  For starters, the Court
considers it rich for Travelers to seek now to limit the permissible scope of
Swift's involvement to "priority of coverage" issues, since that was the one area
on which Travelers maintained a resolute silence.  Moreover, Travelers *did*
control the manner in which it sought to defend, and settle, the Oldread
Action.  But part of its strategy was dragooning Vigilant to participate in
settlement discussions under the guise of resolving priority of coverage issues,
and then (i) refusing to acknowledge what Travelers knew and what Vigilant
believed, which was that the Travelers CGL Policy was second in line, and
(ii) refusing to advise other carriers of Travelers' position with respect to the

---

[26]    *See generally Orion Ins. Co.* v. *Gen. Elec. Co.*, 493 N.Y.S.2d 397, 402 (Sup. Ct. Queens
Cty. 1985), *aff'd sub nom. U.S. Aviation Underwriters, Inc.* v. *Gen. Elec. Co.*, 509
N.Y.S.2d 778 (2d Dep't 1986):

A contract of insurance places upon an insurer the duties of
defending and indemnifying its insured. Each of these duties
carries with it a corresponding right. Along with the duty to
indemnify comes the right to settle on behalf of the insured and, as
a general rule, the insurer has the right to settle with or without
the insured's consent.

legal or contractual availability *vel non* of that Policy for contribution towards the settlement.

Swift sufficiently advised Travelers of her contacts with other claims personnel, with the mediator, and with Oldread's counsel, and at no point did Travelers object to her involvement.[27]   To the contrary, the communications resulting in Swift's appointment plainly were designed by Travelers to get Vigilant to the table to discuss contributions from Vigilant's policy.  And, lest there have been any doubt, Travelers' appointed counsel appeared in Erie County Supreme Court on August 29, 2014, to report the settlement, and there is no indication in the record that counsel advised the court of any impropriety relating to the fact or the nature of Swift's participation in settlement discussions.  Swift's acts did not contravene Travelers' right to defend, and certainly were not indicative of voluntary conduct on Vigilant's part.

Several of Travelers' other arguments have as their premise that Swift merely overreacted, thereby rendering Vigilant's contribution voluntary.  (Def. Br. 19-22, 23; Def. Opp. 6-8).[28]   As the cases discussed in this section confirm, these arguments rely improperly on 20/20 hindsight.  The facts were as the Court has repeatedly described; Swift was eminently reasonable in worrying about the possibility of no contributions from CarvedRock or either of its

---

[27]   Moreover, at least with respect to the mediation, Swift clarifies that she "never made any proposals or offered any money to [Oldread] at the mediation," but rather merely proposed settlement packages to the other claims personnel.  (*See* Pl. 56.1 Opp. ¶¶ 41-45).

[28]   One such comment, referring to "Vigilant's inexplicable and unwarranted hysteria and rush to settle" (Def. Opp. 18 n.8), comes uncomfortably close to perpetuating gender-based stereotypes.  The Court assumes this was unintentional.

insurers and protracted litigation with AIG regarding coverage under either of its excess policies.  And while Travelers repeatedly references an "indisputable" contractual indemnification claim against MSH (*see, e.g.*, Def. Br. 6 n.7, 7 nn.8-9, 21-22, 24 n.14, 26; Def. Opp. 7, 8, 10, 11, 12 & n.5, 26; Def. Reply 1, 7; Def. 56.1 Opp. ¶ 32), there was not then, and there is not today, any definitive resolution of that issue.  Vigilant repeatedly asked Travelers (who concededly controlled the defense) to file an indemnification action against MSH, and Travelers did not do so.  In the context of a last-ditch settlement effort a few weeks before trial, Vigilant was not required to exclude every theoretical possibility of coverage, nor was it required to gamble on the fact that this as-yet-unfiled indemnification lawsuit against AIG would succeed years after the resolution of the Oldread Action.  Instead, in discharging its own obligations to the Zoo, Vigilant was permitted to make a reasonable determination of liability to itself or its insured on the available facts.  Given the information detailed in the Factual Background section, Vigilant plainly did so here.

On this record, the Court easily concludes as a matter of law that Vigilant contributed the $650,000 Payment towards the settlement of the Oldread Action because it reasonably believed that that payment was "necessary to the protection of its [legal or economic] interests," and not voluntarily.  *Broadway Houston Mack Dev., LLC*, 897 N.Y.S.2d at 506. Accordingly, Travelers' motion for summary judgment on the issue of

voluntariness is denied, and Vigilant's motion is granted insofar as it seeks a finding that the Payment was not made voluntarily.[29]

### 4.    A Genuine Dispute of Material Fact Exists Concerning Whether the Settlement of Which Vigilant's Payment Was a Component Was Reasonable

Vigilant's contribution to the Oldread settlement was not merely "not voluntary"; given the now-undisputed priority of coverage, it should have been paid by Travelers under the CGL Policy, and was thus not an obligation for which Vigilant was liable.  Travelers protests, however, that the Oldread settlement (particularly as augmented by Vigilant's $650,000 contribution thereto) was unreasonable.  (*See, e.g.*, Def. Opp. 14-22).  As set forth in the remainder of this section, the Court finds that Travelers has identified genuine and material factual disputes that preclude summary judgment on this issue.

The Court is guided by the Second Circuit's decision in *Luria Brothers & Company, Inc.* v. *Alliance Assurance Co., Ltd.*, 780 F.2d 1082 (2d Cir. 1986), which found in the analogous context of an insurer-insured dispute that

> the insured need not establish actual liability to the party with whom it has settled so long as a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured].

*Id.* at 1091 (citations omitted) (alterations in original); *see also Admiral Ins. Co.*, 947 N.Y.S.2d at 447 ("In addition, the existing record, on which there are no

---

[29]    Given the resolution of this issue, the Court does not address whether Travelers is estopped to deny an obligation to indemnify Vigilant under the Travelers CGL Policy. (*See* Def. Opp. 22-28).

material factual disputes, establishes as a matter of law that the settlement of the underlying action was reasonable."); *Clarostat Mfg. Co.* v. *Travelers Indem. Co.*, 495 N.Y.S.2d 671, 673-74 (1st Dep't 1985) ("The record and the Texas appellate court's decision clearly indicate the reasonableness of the settlement. Clarostat's prospects on retrial were not so favorable as to warrant foregoing an opportunity both to settle for a forty-five percent reduction in the vacated judgment and to terminate further attorneys' fees.").

Vigilant advances a number of reasons why this Court should find, as a matter of law, that the Oldread settlement was reasonable, including:

- The Oldread settlement demand, which was initially $10.5 million in April 2014, had reduced only gradually to $8.3 million as of three weeks before trial (*see* Swift Decl., Ex. H at V136 ($9.3 million), V133 ($8.3 million));

- Travelers' June 2014 survey of jury verdicts in Erie County had concluded that the pain and suffering component of Oldread's claim on its own might be worth $3 million (Chanin Decl., Ex. 10);

- Information was received after Travelers had assessed a $4 million value on the case, including Oldread's need for a second cervical fusion operation and the surgical implantation of wire mesh as a result of an epigastric hernia (Chanin Decl., Ex. 11);

- The Zoo was facing a substantial risk of losing the contributions offered by AIG and Burlington, as if, for example, Judge Bannister were to decide CarvedRock's renewed special employer motion (*see generally* Swift Decl.);

- A report from Vigilant's economics expert, Ronald R. Reiber, Ph.D., concluded that the settlement value of the Oldread Action was reasonable, and sought to rebut a settlement analysis undertaken by Travelers' expert witness, Michael J. Vernarelli, Ph.D., that utilized a

different methodology for calculating the present value of the loss (Reiber Decl.);

- A retired justice of the Fourth Department, Jerome C. Gorski, opined in September 2015 that the settlement was "the product of a back and forth consideration by experienced attorneys and claims representatives working with an experienced mediator and trial judge," and, at base, that it was reasonable (Chanin Decl., Ex. 12);

- Judge Bannister (who, Vigilant suggests, was a plaintiff-friendly judge in a plaintiff-friendly county) communicated to the mediator, James Morris, that she was hoping to get the case settled for $5 million (Swift Decl., Ex. H at V39);

- Travelers previously had been willing to split the settlement with CarvedRock's insurers on a 50-50 basis, until it changed course a few days before the actual settlement of the case, which suggested that a 50-50 split with those carriers was reasonable (Pl. Opp. 16-24; *but see* Def. Reply 10 (contending that the 50-50 split was proposed in the WDNY Coverage Action));

- Deposition testimony from the Zoo's former trial counsel, Gary O'Donnell, acknowledged that a $6 million verdict would likely have been sustained by the Fourth Department (O'Donnell Dep. 113); and

- All of the other defense attorneys and insurance professionals on the case besides Travelers felt that the settlement was reasonable (*see* Pl. Reply 7-8).

Travelers unsurprisingly disagrees, and offers reasons of its own why the settlement was unreasonably high:

- Travelers had repeatedly advised Vigilant that the Zoo, as a negligence-free owner, had a lesser liability exposure than CarvedRock, such that CarvedRock's insurers should have borne a much greater proportion of the settlement (Def. Br. 22-23);[30]

---

[30]   The Court observes that this argument would appear to address more the allocation of the settlement obligation than the reasonableness of the settlement itself.

- Travelers cites numerous prior statements of Vigilant concerning the appropriate size of the settlement, including contemporaneous statements that the case had a settlement value of $4.5 million. (*See* Def. Opp. 14-15). While, as Vigilant notes, these statements may have been understated for purposes of communication to Oldread's counsel and the mediator (*see* Pl. Opp. 27-28; Pl. Reply 11-12), determining the degree to which they were strategically understated is not something in which the Court should engage in summary judgment practice;

- Travelers argues that Vigilant improperly considered estimates in various Travelers documents, such as the June 2014 survey of jury verdicts and the various iterations of the CLLR, which pertained to the "verdict value" of the case and not the settlement value (Def. Opp. 15, 19-20);

- Travelers' expert witness, Dr. Vernarelli, disputed Dr. Reiber's methodology and concluded instead that a reasonable settlement range for the Oldread Action was "$3,660,336 to $4,371,379 for an average of $4,015,858" (Reiber Decl., Ex. 2 at 4);

- Travelers rebuffs Vigilant's reliance on the views of the other counsel and claims professionals, as well as Judge Bannister, on the grounds that (i) none of these individuals was tendered as an expert witness on reasonableness and (ii) discerning reasonableness from their conduct is impermissible *argumentum ad populum* (Def. Opp. 16-18, 20-21);

- Perhaps most importantly, Travelers' claims representative, Gerry Doak, and its staff counsel, Gary O'Donnell, testified that the Oldread settlement was too high. Doak testified at length concerning internal roundtable discussions at which the participants agreed that the $2 million policy limits of the Travelers OCP Policy were sufficient to cover any contribution by the Zoo to the settlement. (*See, e.g.*, Doak Dep. 60-61, 73-74, 77, 105, 109). He also opined that Chubb/Vigilant had settled the matter too early. (*Id.* at 172).[31] O'Donnell, for

---

[31]    *See* Doak Dep. 172:

> We felt that Vigilant should have let the process play out some more.  We felt that they settled the case out from under us.  We felt that the case did not have the value anywhere near what the case

his part, consistently valued the case at $3.5 million (*see,
e.g.,* O'Donnell Dep. 209-12), and believed the actual
settlement figure to be "unreasonable" (*id.* at 168-69).[32]

It is clear that "reasonableness" is a range and not a point.  And in light of

decisions such as *Luria Brothers*, the Court believes that Plaintiff's arguments

for reasonableness have considerable traction.  In fact, the Court also

considered whether Travelers was estopped from denying reasonableness by

failing to object when the settlement was reported to Judge Bannister, and

would have appreciated the parties' further engagement on this issue.  (*See* Pl.

Reply 8 (noting in reply, without providing supporting authorities, that "[i]f

Travelers had believed the amount of the Settlement was too high, it should

have raised its objection then, *before* the Settlement was consummated")).

However, the Court finds that the arguments raised by Travelers raise genuine,

material disputes as the reasonableness of the settlement — or, considering the

application from Travelers' perspective, that Vigilant has raised genuine,

material disputes as to the unreasonableness of the settlement.  For this

---

ultimately settled for.  We felt that they did not accurately analyze
the whole MSH excess coverage position. ...  We felt that based on
the totality of defenses that we could have gotten a better result
had we let the process play out some more.

[32]   *See* O'Donnell Dep. 168:

Q. Do you think these people who agreed to the settlement, Chubb,
AIG over the Carvedrock policy, Burlington as Carvedrock's
insurer, were foolhardy in agreeing to five point three?

A. I'm not going to call them foolhardy.  I would just say in my
opinion I wouldn't have offered it.  I would have paid five point three
[i.e., $5.3 million] after the verdict and not beforehand.

Q. Do you think they were being foolish?

A. I think they were being unreasonable.

reason, this issue must be decided by a jury, and both parties' motions are denied on this point.

## CONCLUSION

For the reasons set forth above, the parties' motions for summary judgment are resolved as follows:  Travelers' motion is DENIED in full; Vigilant's motion is GRANTED to the extent the Court finds that the Payment was not voluntary and that it was not an obligation for which Vigilant was liable, and DENIED in all other respects.  The Clerk of Court is directed to terminate the motions at docket entries 45 and 46.

The parties are further ORDERED to appear for a conference on **Thursday, April 20, 2017, at 3:00 p.m.,** in Courtroom 618 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York, to discuss setting a trial on the issue of the reasonableness of the settlement.

SO ORDERED.

Dated:      March 21, 2017
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge